1

2

3          **UNITED STATES DISTRICT COURT**

4          **EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **1:06-CR-00051 OWW** |
| Plaintiff-Appellee, | |
| v. | **MEMORANDUM OPINION AND ORDER RE: CHALLENGE TO EASTERN DISTRICT OF CALIFORNIA GENERAL ORDER 441 (SHACKLING OF IN-CUSTODY CRIMINAL DEFENDANTS)** |
| **JOHN EVANS,** | |
| Defendant-Appellant. | |
| **UNITED STATES OF AMERICA,** | **1:06-CR-00131 OWW** |
| Plaintiff-Appellee, | |
| v. | |
| **JOHN B. BRANDAU,** | |
| Defendant-Appellant. | |
| **UNITED STATES OF AMERICA,** | **1:06-CR-00175 OWW** |
| Plaintiff-Appellee, | |
| v. | |
| **CHRISTINA ANN CARR,** | |
| Defendant-Appellant. | |

## I.   INTRODUCTION

Before the court for decision are three related appeals, filed by three individual defendants, all of whom were required to make their initial appearances before magistrate judges in the Eastern District of California wearing "full shackles."   All three appeals challenge a district-wide policy of shackling in-custody criminal defendants during initial appearances.   The

challenges are grounded in large part upon the recent Ninth
Circuit decision in *United States v. Howard*, 429 F.3d 843 (9th
Cir. 2005), which rescinded a district-wide shackling policy
implemented by the Central District of California and recognized
that a criminal defendant's due process rights are implicated by
shackling during initial appearances.

Here, defendant Evans made his initial appearance on
misdemeanor charges in the United States Magistrate's Courtroom
in Yosemite National Park wearing full shackles.  He moved to be
unshackled, citing *Howard*, but his motion was denied.
Subsequently, on February 15, 2006, the United States District
Court for the Eastern District of California promulgated General
Order 441 ("GO 441"), which requires that all in-custody
defendants be fully shackled at initial appearances.  Defendants
Brandau and Carr made their initial appearances <u>after</u> the passage
of GO 441, Brandau in the magistrate's court in Yosemite, Carr
before a magistrate judge in Fresno.  Both requested to be
unshackled, but their requests were denied by the presiding
magistrate judges who cited GO 441.

A number of motions are before the court for decision.
First, all three defendants have joined a motion to recuse all of
the Eastern District of California district judges.  (Doc. 9,[1]
Brandau's recusal motion, filed Jun. 7, 2006; *Carr* Doc. 10,
Carr's joinder, filed Jun. 9, 2006; *Evans* Doc. 1, Evans' joinder,
filed Jun. 14, 2006.)  Second, Defendants Carr and Brandau have

---

[1]If not otherwise indicated, all "Doc." references are to
Documents in the Brandau case.

**2**

1  joined in a motion for injunctive relief, specifically requesting

2  an order prohibiting the enforcement of General Order 441 while

3  this appeal is pending.  (Doc. 14, Brandau's motion for

4  injunctive relief, filed Jun. 23, 2006; *Carr* Doc. 14, Carr's

5  joinder, filed June 28, 2006.)  Finally, although Evans, Brandau,

6  and Carr have also appealed the magistrate judges' decisions

7  regarding shackling on the merits, only Brandau's appeal is ripe

8  for decision at this time.  (Doc. 7, Brandau's Brief, filed May

9  26, 2006; Doc. 16, United States' answer, filed June 28, 2006;

10 Doc. 26, Brandau's Reply, filed July 24, 2006.)

11      The recusal and injunctive relief motions were initially set

12 for hearing on July 18, 2006, at which time the parties were

13 afforded additional time to brief certain issues.  The United

14 States filed a supplemental brief on July 22, 2006.  (Doc. 25.)

15 Brandau and Evan filed supplemental briefs on July 26, 2006.

16 (Docs. 27 & *Evans* Doc. 17.)

17

18                    **II.   BACKGROUND**

19      **A.   Summary of the *Howard* Decision**.

20      At the heart of this dispute is the Ninth Circuit's recent

21 decision in *United States v. Howard*, 429 F.3d 843 (9th Cir.

22 2005).  *Howard* involved an interlocutory appeal filed by criminal

23 defendants who challenged the Central District's district-wide

24 requirement that pretrial detainees making their first appearance

25 before a magistrate judge wear leg shackles.  The policy was

26 implemented by the United States Marshals Service for the Central

27 District of California after consultation with the magistrate

28 judges.

**3**

The policy was enacted in April of 2003 by the United States Marshals Service for the Central District of California. The record indicates that the Marshals Service consulted with the magistrate judges before enacting the policy, although it is not clear to what extent. The record also indicates that, historically, defendants in the district generally were not shackled at initial appearances, although there appears to have been at least some period in the past when defendants were both shackled and handcuffed at initial appearances.

<u>There is little in the record to explain why this policy was adopted</u>. The record does not indicate whether any other district in this or other circuits has a similar policy. This record contains the declaration of Robert Masaitis, Chief Deputy United States Marshal for the Central District of California. He states that "it is not possible to conduct an individualized analysis of a defendant at the time of the initial appearance," and further states that the shackling policy is necessary to ensure safety and order in the courtroom. He also states that the need for full restraints is enhanced by the current staffing shortages in the Marshals Service. The declaration does not discuss any more specific security problems that the policy was intended to address, or any incidents that preceded the enactment of the policy.

We also have a memorandum from Adam N. Torres, United States Marshal for the Central District of California, to the district court judges detailing an incident in one district court judge's courtroom in June of 2003. That incident did not relate to a first appearance, but involved conduct of a defendant who was restrained during the reading of his jury verdict of conviction after he verbally attacked Assistant United States Attorneys and an FBI Agent.

*Id*. at 847 (emphasis added).

In each of seventeen cases that were consolidated for the purposes of the *Howard* appeal, "the defendant was represented by the Federal Public Defender and made his initial court appearance shackled. The Federal Public Defender moved that the defendant be permitted to appear without shackles. In some cases, the magistrate judge allowed the Federal Public Defender to argue the motion. In no case did the magistrate judge hold an evidentiary

**4**

1  hearing on the motion.  The magistrate judge denied the motion in

2  each case." *Id*.

3       A district court judge in the Central District reviewed the

4  magistrate judges' rulings in a consolidated appeal.  Citing

5  general safety concerns, the district court affirmed the

6  magistrate judges' shackling decisions.  According to the Ninth

7  Circuit, the district judge did so without any "documentation or

8  explanation of specific problems that led up to the enactment of

9  the shackling policy."  *Id*. at 846.

10      As a threshold matter, the Ninth Circuit determined that the

11 appeal was not moot "because the issues are capable of repetition

12 and will otherwise evade review...," citing *Gerstein v. Pugh*, 420

13 U.S. 103, 111 n.11 (1975).

14            In *Gerstein*, the Supreme Court stated that very brief
            pretrial detention is by nature temporary, because it
15          is most unlikely that any given individual could have
            his constitutional claim decided on appeal before he is
16          released or convicted. *Id.* There the Supreme Court held
            the exception to the mootness doctrine for violations
17          "capable of repetition yet evading review" applied
            because the constitutional violation was likely to be
18          repeated, but would not last long enough to be reviewed
            before becoming moot. *Id.*
19
            An initial proceeding in a criminal case is even more
20          temporary than the pretrial detention at issue in
            *Gerstein*. This case evades review for essentially the
21          same reason. The defendants could not have brought the
            challenges to the shackling by the magistrate judge to
22          the district court, much less to us, before the harm of
            shackling at the initial proceeding was completed.
23
            This situation giving rise to this challenge also is
24          capable of repetition. We acknowledge that we cannot
            assume that criminal conduct will be recurring on the
25          part of these defendants. *See O'Shea v. Littleton*, 414
            U.S. 488, 496 (1974). This case is therefore
26          distinguishable from an abortion case, the classic case
            capable of repetition yet evading review, because we
27          can assume a woman can become pregnant again. *See
            generally Roe v. Wade*, 410 U.S. 113, 125 (1973). This
28          makes no material difference, however, because a future

**5**

> charge assuredly will be brought against someone, and
> the shackling policy would similarly escape review.
>
> For this reason, we have held that a case is capable of
> repetition when the defendants are challenging an
> ongoing government policy.

*Id*. at 852-53 (parallel citations omitted).

The Ninth Circuit also rejected the government's suggestion that "this kind of blanket challenge to a procedure used in prosecutions must be brought as a civil class action rather than within the relevant criminal proceedings in which it arose."  *Id*. at 849.

> Our case law does not establish that a civil forum is
> the exclusive remedy. Indeed, it may be more
> appropriate to decide this case in the context of
> actual prosecutions rather than by resort to
> hypotheticals or generalizations. On a practical level,
> we must understand that this particular challenge could
> not be made in the civil context, because the only
> available attorney to represent these criminal
> defendants is the Federal Public Defender. The Federal
> Public Defender cannot pursue a civil class action on
> their behalf, because there is no provision for the
> appointment of a Federal Public Defender in a civil
> action, and the office of Federal Public Defender is
> barred from instituting any action on its own. *See* 18
> U.S.C. § 3006A(a), Administrative Office of the U.S.
> Courts, Guide to Judiciary Policies and Procedures,
> Vol. VII, Ch. IV. This is still another reason why we
> should not hold that this challenge can proceed as only
> a civil action.

On the merits, *Howard* acknowledged that "shackling a defendant in any judicial proceeding can have negative effects."

> The Supreme Court has stated that "the use of
> [shackling and restraints] is itself something of an
> affront to the very dignity and decorum of judicial
> proceedings that the judge is seeking to uphold."
> Moreover, the Supreme Court expressed concern that
> restraints could greatly reduce the defendant's ability
> to communicate with his counsel. Id. This court has
> noted that shackling may confuse and embarrass the
> defendant, thereby impairing his mental faculties.
> Shackling may also cause the defendant physical and
> emotional pain.

**6**

*Id.* at 851 (internal citations omitted).

The appeals court also acknowledged that, although existing shackling jurisprudence was primarily concerned with situations where shackling might prejudice a <u>jury</u>, the Central District's initial appearance shackling policy nevertheless implicated a defendant's due process rights:

> At a minimum, due process requires that before there is any district-wide policy affecting all incarcerated defendants whom the government must transport to a first appearance, <u>there must be some justification</u>. The Supreme Court has stated that "if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Thus, a pretrial detainee has a substantive due process right against restrictions that amount to punishment.

*Id.* (parallel citations omitted).   The Ninth Circuit, however, expressed some skepticism about Defendants' dual contentions that (1) the propriety of shackling during an initial appearance should be determined under the same standard used to determine whether a defendant can be shackled in front of a <u>jury</u> – namely that "the court must be persuaded by compelling circumstances that some measure is needed to maintain security, and that no less restrictive alternatives are available...." and (2) that "due process requires that there be no restraining whatsoever without an individualized determination."   Without deciding the issue, the Ninth Circuit noted that the standards suggested by Defendants "may go farther than due process requires."   *Id.*

*Howard* then noted that most "[c]ases addressing the substantive due process rights of pretrial detainees typically involve challenges to prison policies" and that "[c]ourts

**7**

ordinarily defer to the expert judgments and professional

expertise of corrections officials." *Id*.  Nevertheless,

"Corrections officials must produce at least some evidence that

their policies are based on legitimate penological

justifications."  The court reasoned that <u>even less deference</u>

might be due government courtroom policies:

> The conduct of judicial proceedings is the domain of
> the courts. Preservation of dignity and decorum are
> necessary for the conduct of judicial proceedings that
> determine issues of liberty and life. For this reason
> this court cannot give the government courtroom
> policies the same degree of deference that it would
> give to the government prison policies.

*Id*.

The *Howard* court suggested a specific test that should be

used to review a courtroom security policy:

> A court should insist on some showing that a policy
> impinging on defendants' freedoms and ability to
> communicate, as well as diminishing the decorum of the
> court proceedings, is reasonably related to a
> legitimate goal. By requiring the government to
> establish the need for the policy, the court can ensure
> that the policy does not constitute punishment of
> pretrial detainees during judicial proceedings.

*Id*. at 852.  Finally, the Ninth Circuit reiterated that there was

in the record of that case "no explanation of whether a similar

shackling policy exists in any other districts...[and] no

evidence of specific instances that show a need for this

shackling policy in the Central District."  *Id.*

> Rather, the only support for the policy is the
> conclusory declaration of a single representative of
> the Marshals Service that the policy is necessary
> because of safety concerns and financial limitations.
> As we have seen, <u>the record contains no evidence of
> safety concerns</u> necessitating this policy in this
> district. There is no basis on which we can assume the
> benefits of the policy outweigh the costs and the
> disadvantages.

**8**

(emphasis added.)  Among the justifications the Ninth Circuit found unacceptable were financial constraints:

> The Supreme Court has already held that financial concerns should <u>not</u> be a justification for cutting back on the constitutional rights of criminal defendants. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 392 (1992). For example, we have held that a city's financial crisis does not allow it to maintain overcrowded jails that deprive people of their constitutional rights. *Stone v. City and County of San Francisco*, 968 F.2d 850, 858 (9th Cir.1992); *see also Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir.1986).

*Id.*

### B.   <u>General Order 441</u>.

General Order 441 was issued on February 15, 2006, after being adopted by a majority of all the judges in the Eastern District.  It provides, among other things, that all defendants will be fully shackled (i.e., in leg shackles, waist chains, and handcuffs) at all initial appearances, without exceptions based on individualized circumstances.

In support of the policy, the court made the following findings:

> 1.   The United States Marshal for the Eastern District of California, who is responsible for the security of the courtroom, recommends full shackling of all detained defendants at all proceedings in order to assure the safety of all persons in the courtroom, including the judge, lawyers, interpreters, court personnel, defendants, and the public.  The Marshal's reasons are provided in the attached memorandum.  The court has accepted the recommendation of the Marshal with the exception of Rule 11 proceedings and long cause proceedings....
>
> 2.   The Eastern District of California has a heavy criminal caseload.  Criminal calendars frequently are lengthy and require the movement of many detained prisoners in and out of the courtroom.

**9**

       3.    Most criminal proceedings are brief such that the time in which a defendant is before the court fully shackled is minimal.

       4.    The alternatives to full shackling are not practical or would merely substitute the presence of much greater numbers of deputy marshals for physical restraints, with no significant increase in decorum or dignity for the defendant.  The resources of the Marshal service in this district are finite.  Unshackling all defendants for all proceedings would cause very considerable delays and would disrupt the operation not just of the calendar court but potentially of all other courtrooms due to the necessity to draw deputy marshals from other courtrooms to provide the additional deputies necessary to assure security when defendants are unshackled.

GO 441 at 2-3.

GO 441 referenced a memorandum from the United States Marshal to the court.  Among other topics, the memorandum specifically addressed security concerns at initial appearances.

We contend the danger of an incident for prisoner violence or disturbance is especially acute at initial appearances before Magistrate Judges given the length of the calendars, the tight quarters, courtroom design, and the proximity to the public and the court family. Initial appearances are the first opportunity our office has [for] extended interaction with the defendants. [FN2]

[FN2] December 2004 (Fresno), a razor blade was discovered in the pocket of an arrestee just prior to their initial appearance.

We have almost no information about newly arrested defendants to determine their histories, propensities to violence,[FN3] or demeanor while in court.  In addition, experience and common sense recognizes initial appearances are particularly unpredictable because of elevated stress resulting from the traumatic event of arrest and newness of custody, combined with the high emotional state of any family members [FN4] in the gallery.

[FN3] In February 2004 (Fresno), prior to initial appearance a USMS guard was assaulted in the cellblock booking area when a detainee's restraints were removed.

[FN4] In 2002 (Sacramento), two spectators/family members were removed from court following a disturbance during a D'Angelo Davis proceeding.

Our understanding of <u>United States v. Howard</u>, [429 F.3d 843 (9th Cir. 2005), is a district-wide policy could be adopted when justified on the basis of present circumstances or past experience.

*Present Circumstance*:

The prisoner population has increased by 40 percent in the Sacramento and Fresno offices, respectively since 2001.   The district's resources and budget have remained flat over the same period.   As of January 2006 our staffing will be 11 percent under our current authorized level.   The budget is important because it enables us to hire additional independent contract guards to augment our work force.   However, this funding has become limited because of the cost of other services.   As the prisoner count and judicial caseload increase, our responsibilities for service of process and fugitive enforcement increases, drawing on our already limited manpower.   This begins to create a safety issue for our deputies in court and in the detention area.

The courtroom design, particularly the Magistrates' courtrooms, is not conducive to safely securing detainees without additional restraints.   Federal courts in the Central District of California and some local courts have hold[ing] areas or barriers in the courts to restrain detainees with limited use of individual restrains. [FN5] We do not have such facilities.

[FN5] In 1993 (Sacramento), a[] summoned individual attempted to flee by running from Magistrate court when he was unexpectedly remanded.   He was subdued by a deputy and Court Security Officer (CSO).

Restraining prisoners is also [necessary] for their safety, though not an assurance. [FN6]   As the number of defendants increase and the length of court calendars increases defendants remain in holding cells longer. [FN7]   We believe boredom and extended interaction between prisoners is a huge factor for incidents in the holding cells. [FN8]   This may not specifically affect court proceedings, but it does contribute to the prisoners' overall demeanor.

11

[FN6] In February 2004 (Sacramento), Vincent Jackson was able to remove his waist chain while handcuffed to it and beat another prisoner in the holding cell behind Judge Levi's courtroom.

[FN7] In August 2005 (Fresno), a prisoner in a holding cell had his handcuffs and waist chain removed to use the toilet.  The prisoner then assaulted another prisoner who had slipped one hand out of his handcuff.  They were physically restrained and separated.

[FN8] In mid 1990 (Sacramento), an argument broke out among ten prisoners in the holding cell behind Judge Burrell's courtroom.  Prisoner Gallant was pepper sprayed by deputies because he continued to attack and head butt other prisoners.

A less tangible but real impact is the reduced efficiencies of the courts and our staff by removal and replacement of restraints.  The task of restraining and un-restraining defendants will slowly eat away at court schedules, bench hours, and attorney-client time, not to mention the safety to the deputies.

*Past Experiences*:

Restraints in court have been a common practice in the Fresno office since 1997 and in Sacramento since 2001. We have learned through training and experience the use of restraints has greatly reduced, not eliminated, prisoner violence and incidents. [FN9]  However, measuring what may have occurred is difficult because of the prevention. [FN10]

[FN9] In 2003, Dwane Mallet spit on his attorney, Kevin Clymo, in court and stood before the jury and told the members he would kill them.

[FN10] In October 2005 (Sacramento), Charles White was removed from Judge Damrell's courtroom after verbally threatening the judge and a testifying witness.  White violently pulled on his restraints and indicated he would fight the deputies if he did not have the restraints on.

In 2005 (Sacramento), Charles White reportedly took a swing with his elbow at his attorney as he was being taken out of the courtroom, and told a deputy in the cell block that he would get the judge if not restrained.

1
2
3
4
5

Even restrained detainees can be a danger to each other, the court family, and deputies. [FN11]  They make or have access to homemade weapons while in county jails.  Or, even more conveniently, the weapons they have access to in the courtrooms.  Such as, the pens and pencils on the podium or attorney's table, electrical cords or wires, binders, clothes hangers, furniture, or even paper clips can be used to attack someone.

6
7

[FN11] In September 2003, Antelmo Ontiveros was found to have a shank in his shoe while being transferred to court from the county jail.

8
9
10

In January 2005 (Fresno), two co-defendants were found with shanks in their possession at the county jail.  One was a pencil with a sharp metal object affixed to the end, wrapped with plastic.  The other was made from a disposable razor.

11
12
13

In October 2005 (Fresno), a detainee was found in possession of a shank made from the blade of a pencil sharpener attached to a spoon handle with a string.

14

*Conclusion:*

15
16
17
18
19
20
21

The lynchpin is that we cannot predict human behavior.  This inability leaves us at a disadvantage in fulfilling [our] roles in safeguarding the Judiciary and the judicial process.  A defendant with a long rap sheet may, unbeknownst to us, intend to cooperate with the government so that he will be docile and cooperative.  Another defendant, with little or no record, may be under great stress because of personal shame, family or employment concerns, or the prospect of a lengthy prison sentence, and decide to act out.  No one can predict with unerring accuracy when that may happen, and we do not want to assume that responsibility.  The risk of an incident outweighs the return of removing restraints.

22  (Amador Letter, Attached to GO 441.)

23       The Amador evidence far exceeds the showing in *Howard* and

24  demonstrates that the Eastern District has a very large criminal

25  caseload per judge and relatively few Deputy United States

26  Marshals assigned to court duty, who cannot maintain adequate

27  security in crowded courtrooms under unpredictable and dangerous

28  conditions.  These concerns are particularly acute at during

**13**

first appearances, where defendants are arraigned and, for some,
issues of pre-trial detention are determined.  As the Marshal
notes, substantial delays to hear individual unshackling motions
threaten to lengthen the already extended and burdensome criminal
calendars in magistrate courtrooms and impose greater demands on
the understaffed Marshals assigned to court duty.

### C.   **Procedure Used to Promulgate GO 441.**

General Orders are, as a general rule, promulgated without
any notice and comment procedure.  GO 441 was not adopted
pursuant to notice and comment rulemaking.

### D.   **Communications between the United States Attorney's Office, the Federal Defender's Office, and the Court Regarding Shackling**.

Prior to the adoption of GO 441, Representatives of the
Federal Defenders Office and the United States Attorney's Office
met with Magistrate Judge Hollows and the Marshal's Service.
(Doc. 23-1 at 2.)  Among other things, the Federal Defender's
Office expressed concerns about full shackling at a defendant's
initial appearance before the Magistrate Judge.  (*Id.*)  The
Federal Defender specifically requested a pilot program of less
shackling at initial appearances.  (*Id.*)  The parties eventually
reached an impasse on the issue.  Thereafter, the Federal
Defender's Office notified the Court and the United States
Attorney's Office that "each Assistant Federal Defender now had
permission to challenge the shackling of a defendant as he or she
saw fit".  (*Id.*)  After that, numerous unshackling motions were
made that had the potential to unduly delay administration of

**14**

1  lengthy criminal calendars in several courtrooms where upwards of
2  twenty defendants appear in each courtroom.

3                    **1.    Defendant Brandau's Arrest History**.

4        On March 26, 2006, Mr. Brandau was arrested by the National
5  Park Service ("NPS") in Yosemite National park for being under
6  the influence of alcohol and for disorderly conduct.  He was
7  booked into the Yosemite Holding Facility.  (Doc. 7-1 at 2.)  The
8  next day, Mr. Brandau had his initial appearance in the United
9  States Magistrate Court in Yosemite, where his counsel requested
10 that Mr. Brandau be unshackled.  (*Id.*)  The magistrate judge
11 denied this request pursuant to General Order 441.  (*Id.*)

12       Mr. Brandau pleaded guilty to the charge of being under the
13 influence of alcohol and was sentenced to twelve months summary
14 probation with the condition that he serve two days in custody
15 with credit for the two days served, pay a $250 fine, and attend
16 alcoholics anonymous.  (*Id.*)  The court ordered Mr. Brandau
17 released from custody forthwith.  (*Id.*)  This ended Mr. Brandau's
18 interaction with the court.

19                    **2.    Defendant Evan's Arrest History**.

20       Mr. Evans was trying to visit his daughter at her elementary
21 school inside of Yosemite National Park.  The school principal
22 telephoned the National Park Service because she believed that
23 there was an order prohibiting Mr. Evans from coming to the
24 school, and because she believed Evans had been drinking.  (*Evans*
25 Doc. 12-1 at 2.)  On February 7, 2006, Mr. Evans was arrested
26 within the park for being under the influence of alcohol,
27 possession of .3 grams of marijuana, and violating a court order
28 from the family court in San Diego.  (*Id.* at 1.)  He appeared in

                                    **15**

court the following day.  (*Id*.)  He was brought from the Yosemite

Holding Facility in a van to the Yosemite courthouse in an orange

jump suit and chains.  A federal public defender represented Mr.

Evans over the telephone.  The public defender requested that

Evans be unshackled and the following discussion ensued:

> **THE COURT:** And what would the need be to unshackle him?

> **MS VORIS:** So that he wouldn't be humiliated and unreasonably burdened at this time when he is only charged.

> **THE COURT:** All right. Well, I think the degree of humiliation is ameliorated by the fact that the only people in this room are court security, my staff, and the prosecutor.

> **MS. VORIS:** Which is also the reason that he should be unshackled.

> **MS. WALDOW:** Your Honor.

> **THE COURT:** Yes.

> **MS. WALDOW:** Your Honor, I'll have to check that cite, but I believe the intent is so that a jury is not unduly prejudiced –

> **MS. VORIS:** No.

> **MS. WALDOW:** -- in this –

> **MS. VORIS:** No. United States vs. –

> **THE COURT:** Wait, wait, wait, Ms. Voris. Don't interrupt. Let her finish.

> **MS. WALDOW:** Plus I would like to add that logistically we only have one jailer and it is difficult to transport, to unshackle, to reshackle a prison (sic) with only one employee available to carry out that task and it would put the ranger at a security risk to do it.
> **THE COURT:** Response?

> **MS. VORIS:** I – the security risk of the ranger is an unreasonable, -- it – this man has not– there's no showing that there's any security risk. United States v. Howard is clear that is [sic] doesn't have to do with juries and the cite on that is 429 Fed.3d 843. And it talks about shackling and restraints, that it is an

**16**

affront to the very dignity and decorum of judicial proceedings that the Judge is seeking to uphold and that shackling may confuse and embarrass the defendant and that it's a denial of due process. And that's the Ninth Circuit Court.

**THE COURT:** Your request is denied. I find that the shackling is reasonable under the circumstances and I think that the safety of the court personnel and the ranger are paramount here.

**MS. WALDOW:** And the Court would take notice that he's not leg shackled. It's just a belly chain.

**THE COURT:** He's only got a belly chain on and handcuffs. He's not shackled in the traditional sense of leg irons and so forth, and I believe he was unshackled to permit him to talk to you on the phone in the lockup.

**THE DEFENDANT:** No, sir. That's not correct.

**THE COURT:**  I beg your pardon?

**THE DEFENDANT:** I was forced to hold my hand up like this so I could have a phone conversation in the – sir.

**THE COURT:** All right. The request for unshackling is denied. ER 5-7; RT 1-3)

(*See* Doc. 12-1, 2-3.)

Mr. Evans entered a guilty plea and was sentenced to (six) months of unsupervised probation, service of two days in custody with credit for two days served, and ordered to pay a fine of $480 and a special assessment of $20.  (*Id.*)  His interaction with the court has ended.

### 3.   Defendant Carr's Arrest History.

On May 11, 2006, an indictment was returned by the Grand Jury charging Ms. Carr with four counts of false claims to a federal agency and four counts of mail fraud. (*Carr* Doc. 15-1 at 2.)  The charges arose from allegations that Ms. Carr made false FEMA claims relating to Hurricane Katrina. (*Id.* at 3.)  A warrant had been issued for her arrest. (*Id.* at 2.)  The

**17**

1   investigating FBI agent informed Ms. Carr that she would be

2   permitted to self-surrender at the Fresno courthouse on May 17,

3   2006, the date of her initial appearance.   On the morning of May

4   17, 2006, instead of going to the courtroom or the Pretrial

5   Service's Office,  Ms. Carr went to the United States Marshal's

6   Office. (*Id.* at 4.)   The Marshals took Ms. Carr into custody and

7   shackled her over her street clothes. (*Id.)*  Counsel for Ms.

8   Carr requested that Ms. Carr be unshackled for her initial

9   appearance in the Fresno magistrate judge court. *Id.*  This

10   request was denied. *Id.*  Ms. Carr entered pleas of not guilty to

11   the indictment and was then ordered released on her own

12   recognizance with a pretrial services interview to follow. *Id.*

13   Ms. Carr was awaiting trial at the time of this motion.

14

15                            **III.   DISCUSSION**

16      **A.   Recusal Motion**.

17      Defendants advance the theory that GO 441 was promulgated

18   and enforced in a manner that violates Brandau's procedural and

19   substantive due process rights.   The Defendants move to recuse

20   all District Court Judges within the Eastern District of

21   California.  (The initial recusal motion was filed in the Brandau

22   case, 1:06-cr-131, Doc. 9, as was the government's opposition,

23   Doc. 18, but the reply brief was filed in the *Carr* case, 1:06-cr-

24   175.)  Their recusal motion is based largely on two statutes, 28

25   U.S.C. § 47 and § 455.**[2]**

26   ─────────────────

27        [2]   Brandau also cites 28 U.S.C. § 292(b)(permitting the
     designation of any district judge in a circuit to hold district
28   court in any district within the circuit) and § 296(providing

                                **18**

## 1.   28 U.S.C. § 47.

28 U.S.C. § 47 provides that "[n]o judge shall hear or determine an appeal from the decision of a case or issue tried by him."  This statute is not the primary focus of the Recusal motion and its application here is supported by little authority or argument.  Brandau cites *Rexford v. Brunswick-Balke-Collender Co.*, 228 U.S. 339 (1913) and *Moran v. Dillingham*, 174 U.S. 153 (1899), both of which construed § 47's predecessor statute, for the unremarkable proposition that "a judge who has once heard [a case] upon its merits in the court of first instance is certainly disqualified from sitting in the circuit court of appeals on the hearing and decision of any question, in the same [case], which involves in any degree [a] matter upon which he had occasion to pass in the lower court."  *Moran*, 174 U.S. at 157.

Brandau also cites a more recent Fourth Circuit case, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 431 F.2d 135 (4th Cir. 1970), in which a Fourth Circuit Judge recused himself from the appeal of a desegregation order because, as a District Judge, he decided similar cases involving the same ultimate question.

There is no authority, however, that directly supports application of § 47 here.  The undersigned judge has not been presented with an unshackling request and has not yet decided whether the shackling order <u>as applied</u> was lawful and/or constitutional; was promulgated correctly; or should be subject

_____

that a judge "shall have all the powers of a judge of the court, circuit or district to which he is designated and assigned"), not as bases for requiring recusal but presumably as sources of authority for designating another district judge within this circuit to hear this case should the recusal motion be granted.

to any exceptions.

## 2.    28 U.S.C. § 455.

Defendants' second argument for recusal is based upon, 28 U.S.C. § 455 which provides in pertinent part that:

> (a)    Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b)    He shall also disqualify himself in the following circumstances:
> (1)    Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
> (2)    Where ...the judge ...has been a material witness concerning it;
> (3)    Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;
> (4)    He knows that he...has...any...interest that could be substantially affected by the outcome of the proceeding....

Under § 455, a judge "does not have to be subjectively biased or prejudiced, so long as he appears to be so." *Liteky v. United States*, 510 U.S. 540, 553 n.2 (1994).  The test is "whether or not given all of the facts of the case there are reasonable grounds for finding that the judge could not try the case fairly, either because of the appearance or the fact of bias or prejudice." *United States v. Conforte*, 624 F.2d 869, 881 (9th Cir. 1980).

Defendants' rely explicitly on the so called "extrajudicial source" doctrine, which the Supreme Court explored in great detail in *Liteky*.  The doctrine finds its origins in earlier recusal cases, including *United States v. Grinnell Corp.*, 384

U.S. 563, 583 (1966), which involved 28 U.S.C. § 144 (recusal upon motion for bias or prejudice of judge). *Grinnell* held "[t]he alleged bias and prejudice to be disqualifying must stem from an extra judicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Id. See also United States v. $292,888.04 in U.S. Currency*, 54 F.3d 564, 566 (9th Cir. 1995) ("[r]ecusal is required only if the bias or prejudice stems from an extrajudicial source and not from conduct or rulings made during the course of proceedings.").

*Liteky* applied the extrajudicial source doctrine to § 455, but clarified that the existence of an "extrajudicial source" was neither a necessary or sufficient condition for "bias or prejudice" recusal. The presence of an extrajudicial source is not sufficient on its own, because "some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not warrant recusal." 510 U.S. at 554.[3] *Litkey,* however, does not further distinguish between the types of extrajudicial information that would demand recusal and those that would be unoffensive. Nor could any other cases be located that provide further clarification.

---

[3]   Nor is the presence of information from an extrajudicial source a necessary condition for recusal because bias could also exist "in the rarest of circumstances" where no extrajudicial source is involved if the judge displayed "deep-seated and unequivocal antagonism that would render fair judgment impossible." *Litkey*, 510 U.S. at 554. This basis for recusal based upon extreme personal bias is not asserted here.

1    The Defendants submit that each of the District Judges in

2 the Eastern District of California possesses two types of

3 extrajudicial information that warrant their recusal:

4 (1) knowledge of the procedural history of the promulgation of GO

5 441; and (2) knowledge of the substantive necessity of the

6 shackling order beyond that set forth in the written record.

7    Even if any or all of the District Judges in the Eastern

8 District possessed information falling into the first category -

9 knowledge of the procedural history of GO 441's promulgation -

10 the import of any such knowledge is significantly diminished by

11 the fact that there was no notice and comment process (or any

12 other public notice process) implemented when GO 441 was

13 promulgated.  The legal inquiry is significantly narrowed by this

14 fact, as any "extrajudicial" information about the process used

15 to generate and issue GO 441 would no longer have any relevance

16 to the recusal inquiry.  (The question remains whether

17 promulgation of GO 441 without any notice/comment runs afoul of

18 the requirements of procedural due process.  This merits issue is

19 discussed below.)

20    The focus of the recusal inquiry turns to any extrajudicial

21 knowledge the judges of this district might have possessed

22 regarding the substantive basis for GO 441, and whether

23 possession of such information warrants recusal.  The caselaw is

24 not particularly instructive on this issue.  The Defendants cite

25 a number of cases in which judges (or adjudicators) were required

26 to recuse themselves from hearing cases in which they previously

27 participated in the same case in a different capacity.  *E.g.,*

28 *United States v. Arnpriester,* 37 F.3d 466 (9th Cir. 1994) (judge

**22**

1   who previously served as United States Attorney in charge of the

2   office that investigated defendant, must recuse himself from

3   hearing case brought against defendant under both 455(a) and

4   455(b)(3), even though, as United States Attorney, he had no

5   *direct* involvement in the investigation); *Clemmons v. Wolfe,* 377

6   F.3d 322 (3d. Cir. 2004) (holding that a federal district judge

7   should have recused himself under 455(a) from presiding over the

8   adjudication of a *habeas-corpus* petition challenging a state-

9   court trial and conviction over which he presided in his former

10  capacity as a state-court judge).

11      But, in those cases, the recused judge was <u>previously</u>

12  involved in the <u>individualized application of the law to a</u>

13  <u>particular defendant</u>.  Here, no district judge in the Eastern

14  District of California has yet heard an individualized challenge

15  to GO 441.  During oral argument, Defendants attempted to frame

16  this purported conflict in various ways, analogizing the

17  promulgation of GO 441 to a legislator casting a vote on a bill.

18  Defendants inquired whether, if that legislator was later

19  elevated to the bench, would she be forced to recuse herself from

20  hearing challenges to the constitutionality of the bill on which

21  she cast a vote.

22      The circumstances here are not precisely parallel to the

23  legislator-turned-judge example.  The judges of this district

24  were called upon to approve a security recommendation of the

25  United States Marshal as a matter of internal court

26  administration.  In so doing, they came to the conclusion that

27  the policy should be otherwise approved with certain adjustments.

28  Although the text of GO 441 does not discuss *Howard*, the attached

**23**

letter from the United States Marshal supporting the policy does.
This underscores that the District Judges considered GO 441 in
light of and in compliance with *Howard*.  The Eastern District
Judges were presented with a court administration security rule
and determined it was necessary and should be promulgated.  Now,
defendants Brandau, Carr, and Evans seek review of GO 441 as it
has been applied in the context of their individualized cases.
This is an as-applied challenge to the law.  There is no
authority that disqualifies a judge, who previously presided over
a facial challenge to a law and rendered a decision on its
validity/lawfulness, from hearing an as-applied challenge to that
law on the ground that she would be inclined to follow the prior
holding.

     Defendants have not provided any authority that squarely
indicates the legislator-turned-judge would be required to recuse
him or herself, let alone any authority that squarely requires
recusal in this case.  Part of judges' responsibilities are to
adopt internal administrative rules for the effective functioning
of the court.  The fact that judges adopted a rule concerning the
restraint of first-appearing detainees does not mean that any
such judge is incapable of impartiality when applying that rule
to the facts and circumstances of a particular case to determine
the lawfulness of the rule.

     In addition to the abstract argument that it is improper for
a judge  who participated in promulgating a rule to sit in
judgment over the validity of that rule as applied in a specific
case after the rule was adopted, the Defendants also allege that
all of the judges in the Eastern District were privy to certain

**24**

ex parte communications with court security personnel.
Defendants assert that these purported communications demand
recusal, citing a number of other cases that involve the recusal
of judges (or quasi-judicial officials) who had substantive ex
parte communications about a case with parties or experts. *E.g.,*
*In Re: Brooks,* 383 F.3d 1036 (D.C. Cir. 2004) (a special master,
appointed in connection with litigation concerning the
mismanagement of Indian trust accounts, should have been recused
from contempt proceedings brought against various government
employees involved in the litigation, because the special master
was party to numerous *ex parte* communications with witnesses and
third parties); *Cobell v. Norton,* 334 F.3d 1128 (D.C. Cir. 2003)
(individual who previously served as Court Monitor should have
been recused from services as a Special Master-Monitor; as Court
Monitor, he had numerous *ex parte* communications with the parties
and significant prior knowledge of the subject matter of the
litigation, on the basis of which he had formed and expressed
opinions of continuing relevance to the litigation).

The Defendants place particular weight on two cases: *In Re:
Kensington Intern. Ltd.,* 368 F.3d 289 (3d. Cir. 2004); and *Edgar
v. K.L.,* 93 F.3d 256 (7th Cir. 1996). *Kensington* involved United
States District Judge Wolin, who was presiding over five
asbestos-related Chapter 11 cases.  Judge Wolin appointed five
"neutral" advisors to inform him about asbestos issues.  However,
two of those advisors, Gross and Hamlin, were simultaneously
representing potential asbestos personal injury claimants in an
unconnected asbestos-related bankruptcy proceeding.  The Third
Circuit concluded that Gross and Hamlin's outside advocacy

**25**

activities created a "clear structural conflict of interest," raising a question as to whether this conflict "irreversibly tainted Judge Wolin," demanding recusal under § 455(a). *Id.* at 304.  The Third Circuit noted that Judge Wolin met with the Advisors as a group on a number of occasions over a 22 month period. *Id.* at 309.  In addition, Judge Wolin conducted numerous ex-parte meetings and conversations with the attorneys "in order to effectively case manage complex litigation...without permission of adversary attorneys." *Id.* at 312.  The Third Circuit found that Judge Wolin's ex parte meetings with the tainted Advisors required his recusal.

*Kensington* held:  "The primary concern..is that a party which held a special position of trust and influence over the judge was found to be not truly disinterested in the outcome of the proceedings."

> Given the unique level of access and influence that Gross and Hamlin had, the length of their appointment, and the overlapping issues and clients, we find that the reasonable person, with familiarity of these circumstances, would conclude that their conflict of interest tainted Judge Wolin.

368 F.3d at 309.

In *Edgar*, class action plaintiffs contended that the mental health care system in Illinois was operated in an unconstitutional manner.  93 F.3d 256.  The presiding district court judge met, *ex parte,* with a panel of experts that he had appointed to investigate Illinois's mental-health institutions and programs, during which meeting the judge received a preview of the panel's conclusions and the panel was afforded an opportunity to persuade the judge that their methodology was

sound.  These *ex parte* communications required disqualification,
particularly in light of the fact that the judge refused any
attempt to reconstruct the content of the meeting:

> Off-the-record briefings in chambers...leave no trace
> in the record-and in this case the judge has forbidden
> any attempt at reconstruction. What information passed
> to the judge, and how reliable it may have been, are
> now unknowable. This is "personal" knowledge no less
> than if the judge had decided to take an undercover
> tour of a mental institution to see how the patients
> were treated. Instead of going himself, this judge
> appointed agents, who made a private report of how they
> investigated and what they had learned. Mandatory
> disqualification under § 455(b)(1) follows.

*Id.* at 259.  *See also Kensington*, 368 F.3d at 309 (noting that
"ex parte meetings are often, as they were here, unrecorded.
Consequently, there is no official record of what was said during
those meetings.").

   *Edgar* cited two cases that are also informative: *In re
School Asbestos Litigation*, 977 F.2d 764 (3d Cir. 1992); *Hatcheck
v. Navistar International Transportation Corp.*, 53 F.3d 36, 41 &
n.4 (4th Cir. 1995).  The Judge in *Asbestos Litigation* attended a
partisan workshop covering material that was the subject of a key
merits issue in an ongoing litigation, while the Judge in
*Hatcheck* made a speech to a Trial Lawyer's Association seminar
where he made remarks that were "pointedly hostile toward
defendants" while a jury trial on the issue of damages was still
pending.  Even though the seminar and the speech were not
directly connected with the ongoing litigation, the events were
open to the public, and evidence could be taken about the
proceedings, they were still grounds for mandatory recusal as
they indicated the judge's bias or inclination for or against a

1   particular party on substantive legal issues.[4]

2       Some of the circumstances found problematic in *Edgar,*

3   *Kensington, Asbestos Litigation*, and *Hatcheck* are arguably

4   present here.  It is essentially undisputable that "ex parte"

5   communications between the District Judges and the United States

6   Marshal for the Eastern District of California occur on a

7   continuing basis, and that such communications did precede the

8   passage of GO 441, as is evidenced by the letter attached

9   thereto.  However, this type of communication between trial

10  judges and security staff is a regular part of court business.

11  Security is a universal concern (and a very serious one) for all

12  judges, parties, and the public present in courtrooms at first

13  appearances, in all districts, in all courtrooms.  Judges and

14  court staff must be permitted to communicate with security

15  ───────────────────

16      [4]    The government relies upon *Ignacio v. Judges of the*
    *United States Court of Appeals for the Ninth Circuit*, --- F.3d

17  ---, 2006 WL 1897117 (9th Cir.), to support its position that
    recusal is not necessary here.  This case is not relevant.  In

18  *Ignacio*, the defendant indiscriminately sued all of the Ninth
    Circuit Judges, along with numerous other government officials.

19  Although noting that, in a typical situation "a federal judge
    'shall' disqualify him or herself when 'a party to the

20  proceeding'" under 28 U.S.C. 455(b)(5)(i), this rule is subject
    to a rule of necessity, carving out an exception for cases in

21  which a plaintiff has sued all the members of an appellate panel.
    This exception serves the purpose of "not permitting a litigant

22  to 'destroy the only tribunal with power in the premises'" and
    applies "where a litigant has named uncritically all the judges

23  of this circuit."  *Id.* at *3.  Here, the Defendants have not
    directly sued the Judges of the Eastern District, so recusal is

24  not required under the "parties to the proceeding" provision.
    However, had the judges been sued, it is likely that the naming

25  of the district court judges would not have been "indiscriminate"
    and would have been based on the fact that the judges voted en

26  banc to promulgate GO 441.

27

28

**28**

personnel freely.  That security concerns must be evaluated and addressed does not predispose a judge to rule one way or another about the lawfulness of particular security measures and whether court security measures comport with due process under the facts and circumstances of a particular case.  Under Plaintiffs' approach, no court could hear and decide the lawfulness of any court rules it is authorized to and does promulgate.

The recusal motions are **DENIED.**

**B.   Merits Issues**.

The only appeal ripe for review at this time, Brandau's, raises the following questions.

> (a)   Was the issuance of GO 441 beyond the rule-making authority conferred upon the District Court by Fed. R. Crim. Pro. 57 and 28 U.S.C. § 2071?
>
> (b)   Was GO 441 issued in violation of Fed. R. Crim. Pro. 57 and 28 U.S.C. § 2071 and the procedural requirements of the Due Process Clause when it was promulgated without prior notice and an opportunity to be heard at an evidentiary hearing to all affected parties?
>
> (c)   Was GO 441 issued in violation of Fed. R. Crim. Pro. 57 and 28 U.S.C. § 2071 and the procedural requirements of the Due Process Clause when it was promulgated without a sufficient showing of its necessity?
>
> (d)   Does the application of GO 441 to Mr. Brandau, and other similarly situated in-custody defendants in Yosemite National park, violate the procedural and substantive requirements of the Due Process clause when shackling was ordered solely on the basis of the GO, with no individualized showing of need either for Mr. Brandau to be shackled personally or for the application of the district-wide shackling policy in the park?

(Doc. 7-1 at 1.)

//

//

### 1.   Was the Issuance of General Order 441 Beyond the Court's Rulemaking Authority?

The authority of the United States District Courts to adopt and promulgate local rules emanates from three sources.  First, Congress has vested the Supreme Court with the authority to prescribe rules of practice and procedure for the federal courts. 28 U.S.C. § 2072(a).  Pursuant to that authority, the Supreme Court has adopted Federal Rule of Criminal Procedure 57.  Rule 57 of the Federal Rules of Criminal Procedure provides in pertinent part:

> Each district court acting by a majority of its district judges may, after giving appropriate public notice and an opportunity to comment, make and amend rules governing its practice. A local rule must be consistent with--but not duplicative of--federal statutes and rules adopted under 28 U.S.C. § 2072 and must conform to any uniform numbering system prescribed by the Judicial Conference of the United States.

Fed. R. Crim. Pro. 57(a)(1).  Second, Congress has vested federal district and circuit courts with the independent authority to prescribe local rules of practice consistent with Acts of Congress and the rules of practice and procedure promulgated by the Supreme Court.

> The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed under section 2072 of this title.

28 U.S.C. § 2071(a).

Finally, the Supreme Court has recognized that district courts have certain inherent rule-making powers arising from the nature of the judicial process.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  These inherent powers include, the "power to

impose silence, respect, and decorum, in their presence, and
submission to their lawful mandates," "the power to control
admission to its bar and to discipline attorneys who appear
before it," "the power to punish for contempts", "the inherent
power...to vacate its own judgment upon proof that a fraud has
been perpetrated upon the court." *Id.* at 43-44.  A "court may
bar from the courtroom a criminal defendant who disrupts a
trial," "dismiss an action on grounds of forum non conveniens,"
and "it may act sua sponte to dismiss a suit for failure to
prosecute." *Id.* at 44.

Consistent with these principles, the Supreme Court has
upheld the authority of district courts to promulgate local rules
unless 1) the rule conflicts with an Act of Congress; 2) the rule
conflicts with the rules of procedure promulgated by the Supreme
Court; 3) the rule is constitutionally infirm; or 4) the subject
matter governed by the rule is not within the power of the
district court to regulate. *See Frazier v. Heebe*, 482 U.S. 641,
654, (1986) (Rehnquist, C.J., dissenting) (citing *Colgrove v.
Battin*, 413 U.S. 149, 159-60, 162-64, (1973); *Miner v. Atlass*,
363 U.S. 641, 651-52, (1960); *Story v. Livingston*, 38 U.S. 359,
368 (1839)).  Also, the Supreme Court has struck down a local
rule which it deemed "unnecessary and irrational." *Id*. at 646
(majority opinion).  It follows that "Local Rules are
presumptively valid unless they contravene one of the five
principles mentioned above." *Whitehouse v. United States Dist.
Court*, 53 F.3d 1349, 1356 (1st Cir. 1995).

Defendants argue that the subject matter of GO 441 is beyond
the rulemaking authority of the district court.  Courts in other

1   districts have used local rules or general orders in order to
2   provide security within the courtroom.  In *United States v.*
3   *Jackson*, 549 F.2d 517, 526 (8th Cir. 1977), a general order
4   authorized maximum security measures in any case that was likely
5   to be widely publicized.  These maximum security measures
6   included "the presence of five plain clothes United States
7   Marshals in the courtroom, the posting of several Marshals
8   outside the front doors of the courtroom and the use of an
9   electronic metal detecting device on all spectators entering the
10  courtroom."  *Id.*  The court found that "the security measures
11  utilized here [were] appropriate under the circumstances and well
12  within the discretion of the trial court."  *Id.*; *see also United*
13  *States v. Edwards*, 235 F.3d 1173, 1175 (9th Cir. 2000) (for
14  safety and security reasons, local rule allows for all exhibits
15  to be placed within the custody of the clerk, except weapons and
16  other sensitive material).

17      A court has the ability to promulgate rules regarding
18  security within the courtrooms.

19

20              **2.   Was Notice and Comment Required?**

21      Even though the subject matter of GO 441 was appropriate for
22  rulemaking by the Eastern District, it does not necessarily
23  follow that it was appropriate to pass such a rule in the form of
24  a General Order, without the notice and comment required under
25  the Local Rules, Federal Rule of Criminal Procedure 57, or 28
26  U.S.C. § 2071(a).

27      In the Eastern District, Local Rule 1-102(a) defines the
28  scope of local rules, and explains that only matters that do not

                              **32**

fall within the scope of the Local Rules may be promulgated via a General Order:

> These rules govern all litigation in the United States District Court for the Eastern District of California, the boundaries of which are set forth in 28 U.S.C. § 84. <u>Outside the scope of these Rules are matters relating to internal court administration that, in the discretion of the Court en banc, may be accomplished through the use of General Orders, provided, however, that no matter appropriate for inclusion in these Rules shall be treated by General Order</u>. No litigant shall be bound by any General Order.

Local Rule 1-102(a)(emphasis in added). However, no Local Rule specifically defines those topics which properly fall within the "scope" of "litigation" under of Local Rule 1-102(a). Both Rule 83 of the Federal Rules of Civil Procedure and Rule 57 of the Federal Rules of Criminal Procedure permit each district court to promulgate local rules governing "practice" after "appropriate public notice and an opportunity to comment." These rules limit the scope of rules promulgated under either authority to rules concerning "practice."

There is sparse authority addressing when it is appropriate to issue rules <u>without</u> any notice and comment. One Ninth Circuit case is arguably on point: *United States v. Terry*, 11 F.3d 110 (9th Cir. 1993), where a single judge issued a general order regarding the procedures for filing declarations in support of certain criminal motions. Terry filed a criminal motion in violation of that general order, but asserted that he had no notice (actual or constructive) of the order. The Ninth Circuit found that general order was subject to the notice and comment provisions of Federal Rule of Criminal Procedure 57, which "provides for the making of local rules in criminal cases" and

requires "that newly adopted district rules should be made

available to the public."

> While we do not doubt the district court's power to regulate its practice in criminal cases in a manner consistent with the Federal Rules of Criminal Procedure and Local Rules, we find the notice of G.O. 384 was inadequate. In Wardlow, we held that the district court properly denied a request for an evidentiary hearing on a motion to suppress evidence because Wardlow forfeited his right to an evidentiary hearing by not properly submitting a declaration pursuant to a local rule. However, Wardlow is distinguishable in that, in this case, the court relied on a General Order of which neither the defendant nor his attorney had notice. We recognize that, in promulgating local rules, a district court has "considerable latitude" in calibrating its public notice method to the individual needs of its jurisdiction. 7 J. Moore & J. Lucas, supra, ¶ 83.02 at 83-5. However, G.O. 384, which was used as a basis to deny Terry an evidentiary hearing, is a one-judge order posted on the courthouse bulletin board and published in a local legal newspaper. Terry and his attorney received no actual notice of G.O. 384. Therefore, the district court abused its discretion in denying the motion to suppress without allowing Terry an opportunity to present evidence

11 F.3d at 113.

Although the general order at issue in *Terry*, issued by a single judge and concerning administrative filing requirements, is not precisely equivalent to GO 441, *Terry* is the only case that discusses the procedural requirements applicable to a General Order.  Terry appears to require at least some procedural due process protections when promulgating a general order that concerns practice requirements.

Two other cases provide guidance.  In *Truesdale v. Moore*, 142 F.3d 749, 760-61 (4th Cir. 1998.), the Fourth Circuit considered a challenge to an order adopted by the Fourth Circuit's Judicial Council.  That order, which governed death penalty representation within the Fourth Circuit, had several

purposes, the second of which was challenged in *Truesdale*:

> ...Order No. 113 imposes on district courts and the circuit court a timetable for deciding petitions brought under 28 U.S.C. §§ 2254 and 2255 by defendants who are under sentence of death. District courts are instructed to render a decision and enter final judgment within 180 days of the date on which the petition is filed, subject to an extension of up to thirty days if the court determines that justice so requires. The court of appeals is directed to render a decision within 120 days of the date on which petitioner's reply brief is filed. The court of appeals is also to rule on any petition for rehearing or suggestion for rehearing en banc within thirty days of the date the petition or suggestion is filed or the date a response thereto is filed, whichever is later. And if rehearing is granted, any hearing must be conducted and a final decision rendered within 120 days of the entry of the order granting rehearing. If a case is not timely decided the Circuit Executive may seek an explanation of the reasons why the court has not complied with the time limitations. One reasonable explanation, for example, would be that a court needed to hold a case for a critical decision of the Supreme Court or the Fourth Circuit.

*Id.* at 758.  Truesdale argued that the Judicial Council of the Fourth Circuit violated 28 U.S.C. § 332(d)(1), which contains a notice and comment provision similar to that contained in Federal Rules of Criminal Procedure 57 and Federal Rule of Civil Procedure 83.  Specifically, § 322(d)(1) requires that any rule or order "relating to practice and procedure shall be made or amended only after giving appropriate public notice and opportunity for comment." *Id.* at 760.  The *Truesdale* court rejected the argument that Order No. 113 was invalid for failing to comply with the notice and comment requirement, reasoning:

> In drafting and considering Order No. 113, the Judicial Council addressed a simple, <u>internal</u> problem: the delay within the Fourth Circuit in cases involving collateral review of capital sentences. The Council selected an internal solution to that problem and determined that no public notice and comment period were necessary. Order No. 113 imposes requirements on judges and courts within the Fourth Circuit. <u>The order is not addressed</u>

> to litigants or litigators, the usual focus of
> procedural rules. Nothing in the order alters any
> briefing or other deadlines placed on counsel. Nothing
> creates a right in any party to enforce the court's
> internal deadlines. Thus Order No. 113 is not a rule of
> practice or procedure for which notice and comment are
> required.

*Id.* In applying notice and comment language that is distinctly

similar to that applicable here, *Truesdale* distinguishes between

purely internal, administrative rules and rules that "impact"

upon litigants or litigators.  This same distinction is echoed in

the Eastern District of California's Local Rule 1-102(a)

> These rules <u>govern all litigation</u> in the United States
> District Court for the Eastern District of California,
> the boundaries of which are set forth in 28 U.S.C. §
> 84.  Outside the scope of these Rules are matters
> relating to internal court administration that, in the
> discretion of the Court en banc, may be accomplished
> through the use of General Orders, provided, however,
> that no matter appropriate for inclusion in these Rules
> shall be treated by General Order.  <u>No litigant shall
> be bound by any General Order</u>.

(emphasis in original)

     The Eastern District of California has passed other general

orders that relate to security matters within the courthouse.

For example, General Order 249 prohibits the introduction of

firearms or other dangerous weapons into the courtrooms, except

by duly authorized security personnel.  However, this same

provision was later authorized by Local Rule 83-103, which

provides in relevant part that the use of unauthorized weapons in

the courthouses is prohibited.  Also, rules regarding weapons in

United States Courthouses are explicitly authorized by a separate

statute, 28 U.S.C. § 930.

     GO 441 affects practice within the district and magistrate

courts and impacts and affects litigants and litigators, as they

1   appear in court, communicate, and conduct business concerning

2   their rights and liberty.  Demeanor, decorum, and the appearance

3   of fairness in the administration of criminal justice are all

4   implicated.  GO 441 should have been promulgated as a local rule

5   pursuant to Federal Rule of Criminal Procedure 57 with

6   appropriate public notice and an opportunity to comment.  The

7   order is remanded to the district court judges for re-

8   promulgation in accordance with the notice and comment

9   requirements and for development of a complete record as *Howard*

10  requires.

11

12          **C.    Vacatur on Remand**.

13          The Defendants argue that the GO 441 should be invalidated

14  and rescinded pending re-promulgation.  At first glance, *Howard*

15  appears to support Defendants' position.  In *Howard*, after

16  finding the shackling policy unjustified by the record, the Ninth

17  Circuit rescinded the rule without "preclud[ing] reinstatement of

18  a similar policy upon a showing of adequate justification."  429

19  F.3d at 852.

20          However, there are some parallel circumstances in which

21  courts have allowed rules to remain in place pending the

22  completion of remand.  For example, in Administrative Procedure

23  Act ("APA") cases, where an agency rule is found to be unlawful,

24  the rule is normally vacated.  *Alsea Valley Alliance v. Dept. of

25  Commerce*, 358 F.3d 1181, 1185 (9th Cir.2004).  However, where

26  equity demands, a rule may remain in force pending the completion

27  of a remand.  This occurs frequently in endangered species act

28  cases, where vacating a rule would eliminate protection for a

species that is on the brink of extinction.  *See Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).  Some courts have examined the following factors when deciding whether to vacate or retain a defective rule during remand:

> (1) the consequences of invalidating or enjoining the agency action.
>
> (2) potential prejudice to those who will be affected by maintaining the status quo.
>
> (3) the magnitude of the administrative error and how extensive and substantive it was.
>
> (4) the purposes of the substantive statute under which the agency was acting.

*See e.g., Natural Res. Def. Council v. Dept. of Interior*, 275 F. Supp. 2d 1136, 1144 (C.D. Cal. 2002) (citations omitted); *see also Endangered Species Committee of Building Industry Assn. of S. Cal. v. Babbit*, 852 F. Supp. 32, 41 (D.D.C. 1994)(citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982).

Here, in a criminal case, the circumstances suggest a slightly modified analysis that considers: (1) the consequences for court security that would result from invalidating the rule, (2) the potential prejudice to individual defendants who would be shackled during the interim period, and (3) the magnitude of the procedural failure.  (There is no statute that directly governs the subject matter of GO 441, eliminating the fourth factor.)[5]

_____

[5]     It is appropriate to borrow the vacatur factors from the civil context.  In *Howard*, the court observed that the case should not proceed as a civil case because the parties in interest were represented by Federal Public Defenders, limited by statute from appearing in a civil action (other than habeas

1    Here, the magnitude of the procedural failure does not weigh
2    heavily in either direction.  Although, on balance, the law
3    requires notice and comment here for the shackling policy, it
4    does not contain such a clear command so as to indicate a gross
5    procedural oversight in adopting GO 441.

6    The other two factors have arguably been balanced by the
7    Ninth Circuit in *Howard*, which took into consideration both
8    security needs and the due process rights of the individual
9    defendant.  *Howard* rescinded the Central District's shackling
10   policy, reasoning that there had been no "showing of adequate
11   justification."  429 F.3d at 852.  At a minimum, the Ninth
12   Circuit required "<u>a showing sufficient to support a reasoned</u>
13   <u>determination that the policy is justified on the basis of past</u>
14   <u>experiences or present circumstances in the Central District</u>."
15   *Id*.

16   First, there is no record evidence that directly addresses
17   the security situation in either the Yosemite, Bakersfield, or
18   Redding magistrate judge courts.  The imposition of the shackling
19   policy on an interim basis cannot be justified in those
20   courtrooms.

21   There is considerably more evidence regarding security
22   issues in courtrooms in Fresno and Sacramento and the adverse
23   consequences of invalidating GO 441 on security operations in
24   those courthouses.  The Amador letter attached to GO 441
25   specifically indicates that "Restraints in court have been a

26   _____

27   corpus), and prohibited form initiating any action on their own.
     Howard, 429 F.3d at 849.  However, that court referred by analogy
28   to civil class actions in deciding mootness.  *Id*. at 848-49.

**39**

common practice in the Fresno office since 1997 and in Sacramento

since 2001." (Amador Letter at 3.) According to Amador, "the

use of restraints has greatly reduced, not eliminated, prisoner

violence and incidents." (*Id.*) The letter also lists numerous

security incidents that have taken place in recent years in

Fresno and Sacramento:

> [FN2] December 2004 (Fresno), a razor blade was discovered in the pocket of an arrestee just prior to their initial appearance.

> [FN3] In February 2004 (Fresno), prior to initial appearance a USMS guard was assaulted in the cellblock booking area when a detainee's restraints were removed.

> [FN4] In 2002 (Sacramento), two spectators/family members were removed from court following a disturbance during a D'Angelo Davis proceeding.

> [FN5] In 1993 (Sacramento), an summoned individual attempted to flee by running from Magistrate court when he was unexpectedly remanded. He was subdued by a deputy and Court Security Officer (CSO).

> [FN6] In February 2004 (Sacramento), Vincent Jackson was able to remove his waist chain while handcuffed to it and beat another prisoner in the holding cell behind Judge Levi's courtroom.

> [FN7] In August 2005 (Fresno), a prisoner in a holding cell had his handcuffs and waist chain removed to use the toilet. The prisoner then assaulted another prisoner who had slipped one hand out of his handcuff. They were physically restrained and separated.

> [FN8] In mid 1990 (Sacramento), an argument broke out among ten prisoners in the holding cell behind Judge Burrell's courtroom. Prisoner Gallant was pepper sprayed by deputies because he continued to attack and head butt other prisoners.

> [FN9] In 2003, Dwane Mallet spit on his attorney, Kevin Clymo, in court and stood before the jury and told the members he would kill them.

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

    [FN10] In October 2005 (Sacramento), Charles White was
    removed from Judge Damrell's courtroom after verbally
    threatening the judge and a testifying witness.  White
    violently pulled on his restraints and indicated he
    would fight the deputies if he did not have the
    restraints on.
        In 2005 (Sacramento), Charles White reportedly
    took a swing with his elbow at his attorney as he was
    being taken out of the courtroom, and told a deputy in
    the cell block that he would get the judge if not
    restrained.

    [FN11] In September 2003, Antelmo Ontiveros was found
    to have a shank in his shoe while being transferred to
    court from the county jail.
        In January 2005 (Fresno), two co-defendants were
    found with shanks in their possession at the county
    jail.  One was a pencil with a sharp metal object
    affixed to the end, wrapped with plastic.  The other
    was made from a disposable razor.
        In October 2005 (Fresno), a detainee was found in
    possession of a shank made from the blade of a pencil
    sharpener attached to a spoon handle with a string.

14   While not all of these incidents are directly connected with

15  initial appearances, Amador indicates why initial appearances

16  present particularly acute security issues in this district.

17

18

19

20

21

22

23

24

    The prisoner population has increased by 40 percent in
    the Sacramento and Fresno offices, respectively since
    2001.  The district's resources and budget have
    remained flat over the same period.  As of January 2006
    our staffing will be 11 percent under our current
    authorized level.  The budget is important because it
    enables us to hire additional independent contract
    guards to augment our work force.  However, this
    funding has become limited because of the cost of other
    services.  As the prisoner count and judicial caseload
    increase, our responsibilities for service of process
    and fugitive enforcement increases, drawing on our
    already limited manpower.  This begins to create a
    safety issue for our deputies in court and in the
    detention area.

25

26

27

28

    The courtroom design, particularly the Magistrates'
    courtrooms, is not conducive to safely securing
    detainees without additional restraints.  Federal
    courts in the Central District of California and some
    local courts have hold[ing] areas or barriers in the
    courts to restrain detainees with limited use of
    individual restrains. [FN5] We do not have such
    facilities.

**41**

1  (*Id.* at 2.)

2      Admittedly, *Howard* precludes consideration of budgetary

3  constraints in the due process calculus.   429 F.3d at 852.

4  However, the physical design of the magistrate judges'

5  courtrooms, proximity of the public to defendants and attorneys,

6  in combination with the ever-increasing criminal caseload and

7  daily calendar length are relevant to the inquiry.

8      The Amador letter provides a greater degree of justification

9  for shackling in Sacramento and Fresno than was present in the

10  record before the Ninth Circuit in *Howard*.   The *Howard* court

11  described that record as follows:

12          The record does not indicate whether any other district
            in this or other circuits has a similar policy. This
13          record contains the declaration of Robert Masaitis,
            Chief Deputy United States Marshal for the Central
14          District of California. He states that "it is not
            possible to conduct an individualized analysis of a
15          defendant at the time of the initial appearance," and
            further states that the shackling policy is necessary
16          to ensure safety and order in the courtroom. He also
            states that the need for full restraints is enhanced by
17          the current staffing shortages in the Marshals Service.
            The declaration does not discuss any more specific
18          security problems that the policy was intended to
            address, or any incidents that preceded the enactment
19          of the policy.

20          We also have a memorandum from Adam N. Torres, United
            States Marshal for the Central District of California,
21          to the district court judges detailing an incident in
            one district court judge's courtroom in June of 2003.
22          That incident did not relate to a first appearance, but
            involved conduct of a defendant who was restrained
23          during the reading of his jury verdict of conviction
            after he verbally attacked Assistant United States
24          Attorneys and an FBI Agent.

25  429 F.3d at 847-48.

26      Here, the Amador letter provides a number of examples of

27  dangerous security breaches in Sacramento and Fresno, and

28  describes practical and logistical reasons, including size and

**42**

1  configuration of the courtrooms, why security is of great concern

2  during initial appearances in those courthouses.  There is

3  sufficient justification in the record to keep GO 441 in force in

4  these two courthouses until a new rule can be promulgated by the

5  court on remand.[6]  This conclusion does not preclude a future

6  challenge to any re-promulgated rule or its implementation in

7  Sacramento and Fresno.[7]

8

9        **D.   <u>Injunction Pending Appeal</u>**.

10       Plaintiffs also requested an injunction barring enforcement

11 of GO 441 pending the completion of these appeals.  As GO 441 was

12 promulgated without notice and comment and there are strong

13 reasons to allow the rule to remain in effect in Sacramento and

14 Fresno pending re-promulgation, the request for injunctive relief

15 is **DENIED AS MOOT, except as to Yosemite, Bakersfield and**

16 **Redding**.  In those courthouses, the rule shall not be applied

17 before it is re-promulgated.  However, this does not prevent the

18 United States Marshal's Service or any agency then providing

19 courtroom security from utilizing such lawful and reasonable

20 security procedures as are necessary to protect the public,

21 defendants, court officers and staff, and appearing attorneys.

22

23 _____

24       [6]   The district court on remand may re-promulgate a rule
      on a temporary basis, without notice and comment, if the court

25 determines that there is an immediate need for such a rule.  28
      U.S.C. § 2071(e).  But, "such court shall promptly thereafter

26 afford such notice and opportunity for comment."  *Id.*

27       [7]   It is acknowledged that Ms. Carr mounted such a
      challenge here.  She has prevailed on the ground that the rule

28 was promulgated incorrectly.

### IV.   <u>CONCLUSION</u>

For the reasons set forth above, General Order 441 is remanded to the United States District Court for the Eastern District of California for re-promulgation with appropriate public notice and opportunity to comment.  The rule is rescinded with respect to its operation in Bakersfield, Redding, and Yosemite, but shall remain in force during remand for the Sacramento and Fresno courthouses.

**SO ORDERED**

**Dated: August 10, 2006**

                                        **/s/ Oliver W. Wanger**
                                        **OLIVER W. WANGER**
                                        **United States District Judge**